IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| PAUL WILLOUGHBY, PHILLIP DAVIS, AND CRYSTAL FOSTER-GADSDEN FOR AND ON BEHALF OF THEMSELVES AND OTHER PERSONS SIMILARLY SITUATED, | |
| **Plaintiffs,** | CIVIL NO. 1:13-cv-03910-SCJ |
| v. | |
| YOUTH VILLAGES, INC. | |
| **Defendant.** | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DECERTIFY CLASS

## I.    SUMMARY OF ARGUMENT

This case involves allegations that Defendant failed to pay overtime pay to a class of Teacher Counselors as a result of an automatic break deduction used by the payroll software implemented by Defendant.

Defendant is a not-for-profit charitable organization that provides counseling and other support services for troubled children and their families. At the Douglasville, Georgia location that is the subject of this lawsuit, Defendant provides therapeutic residential care and group home care on a 1,200 acre campus

with satellite facilities. Currently, there are 8 units within the intensive residential facility (Psychiatric Residential Treatment Facility "PRTF")  and two separate off-campus group homes (Room Board Watchful Oversight "RBWO") for children needing less intensive services as well as one of these units on campus**.**  The units are divided according to the ages, sex, behavioral issues and method of reimbursement.  At any one time, each of these units are separately supervised by one teacher counselor, one supervisor per unit, and one manager supervising two units.  There are typically over 10-13 children served at each of these 9 units.

Teacher counselors in each unit are responsible for day-to-day counseling and teaching life skills to the children on the unit. Senior teacher counselors, sometimes referred to as "lead" teacher counselors, are responsible for coaching more junior teacher counselors in respect to paperwork required by government regulations and other requirement of the job.  Lead teacher counsels also work with the children.  The lead teacher counselor role varies from unit to unit, depending on the expectations of the program manager and supervisors on each unit. The teacher counselors report to supervisors, who report directly to the program manager in charge of the unit.  There are two Assistant Directors, one over RBWO and the other over PRTF, who report to the Director of the facility.

Nine of the eleven groups are on campus.  Two groups are approximately

one-half mile off campus.  Each of the units has its own supervisor and the teacher counselors work in three separate shifts (1st, 2nd, and 3rd).  The first shift is from 7:00 a.m. to 3:30 p.m. and emphasizes both life skills and academic activities.  The second shift begins at 3:00 p.m. and is involved in recreational activities, planning behavioral goals and family therapy.  The third shift lasts from 11:00 p.m. to 7:30 a.m. (during this shift the children are sleeping) and the weekend shifts consists of extended 16 hour days.  *See* supporting Declaration of Sherry Kollmeyer attached hereto as Exhibit 1.

Originally, three Plaintiffs filed this lawsuit.  By the end of the opt-in period, 52 new Plaintiffs elected to opt-in.  Since the filing of the Complaint, four (4) opt-in Plaintiffs have sought dismissal of their claims, leaving 48 total Plaintiffs. These teacher counselors are from different units, different shifts, different inclusive dates of employment, and range in tenure from a few months to over three years.  They were supervised by more than 23 different supervisors (Exhibit 1, Kollmeyer Declaration, ¶ 18).  According to the testimony of Plaintiffs, as will be discussed below, Plaintiffs vary as to their knowledge of how they were paid, differ in respect to whether or not they were allowed to take breaks in various units, differ in whether they disclosed pay discrepancies to management, differ in whether they sought correction of pay discrepancies through proper channels,

differ in the procedures in their particular units for taking breaks, their understanding of the method by which they were paid (i.e., the fluctuating work week), their contentions concerning the frequency with which a break would be denied due to a crisis in a particular unit or if they were denied at all.[1] They also differed in their efforts to communicate to Defendant that they had worked during any breaks or merely kept that information to themselves.

---

[1]       Despite plaintiffs' contentions to the contrary, automatic break deductions are <u>not</u> contrary to the record keeping requirements of the FLSA.  In *White v. Baptist Hospital*, 134 S. Ct. 296, 187 L.Ed. 2d 153, the United States Supreme Court addressed almost exactly the method adopted by Youth Villages in accounting for automatic break deductions.  The court found it permissible for nurses who engaged in similar enterprise as the teacher counselors in this case to be required to self-report breaks not taken when, for convenience of the operation, automatic break reductions were entered by the timekeeping software.

Relying on the reasoning of the court below and decisions from the Fifth, Eighth, and Ninth Circuits, the Supreme Court reasoned that "[u]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." (citing *Hertz v. Woodbury County*, 566 F.3d 775, 781-82 (8th Cir. 2009); *Newton v. City of Henderson*, 47 F.3d 746, 749-50 (5th Cir. 1995); *Forrester v. I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414-15 (9th Cir. 1981)).  This is because, "[w]hen the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." Thus, the Sixth Circuit recognized that the failure to report unpaid work time is significant because it bears on the employer's knowledge (or lack thereof) of the uncompensated work time and is subsumed in the broader analysis of whether the employer had actual or constructive knowledge, regardless of the source.

To the contrary, as part of its analysis, the Sixth Circuit expressly considered whether Baptist otherwise had knowledge of White's alleged unpaid work:

> White occasionally told her supervisors that she was not getting her meal breaks. But she never told her supervisors that she was not being compensated for missing her meal breaks. Accordingly, there is no way Baptist should have known she was not being compensated for missing her meal breaks. Therefore, her claims fail.

As the court noted, "[t]he relevant knowledge is not 'I know that the employee was working,' but [instead] 'I know the employee was working and not reporting time." (App. 11a)(quoting *Raczkowski v. TC Construction Co., Inc.*, 1993 U.S. App. LEXIS 26257, at *3 (9th Cir. Sept. 30, 1993)(citing *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)).  Based on its finding that Baptist lacked actual or constructive knowledge of White's unpaid meal-break work, the court affirmed summary judgment in favor of Baptist on White's claims. (App. 15a-16a).

*See also* Wage and Hour Div., U.S. Dep't of Labor Fact Sheet No. 53, The Health Care Industry and Hours Worked (July 2009), ECF No. 373-16 ("Dep't of Labor Fact Sheet") (recognizing that the FLSA permits automatic deduction policies).

The teacher counselors' shifts were supervised by managers and supervisors. Since the schedules, supervisors, staffing and activities varied from unit to unit and shift to shift, year to year and month to month, the incidents of overtime and the ability of the teacher counselors to take breaks varied. To date, Defendant has taken sample depositions of thirteen opt-in Plaintiffs and declarations of putative Plaintiffs who did not opt-in. In respect to missing breaks, there is a wide variation between the members of this sample in respect to units and shifts, time frames and the identity of the supervisor or manager of each. Further, as will be discussed below, there were also wide variations in their efforts to report missed breaks. Several teacher counselors successfully had pay discrepancies corrected, others made no attempts and actually did not disclose missed breaks (discussed below with citations to the record.)

Plaintiffs' principal claims in this case are that the use of the automatic break function on the Kronos time keeping system resulted in Plaintiffs being shorted overtime compensation, that time and one-half and not half time is at issue in respect to overtime since Plaintiffs allegedly did not have a clear understanding of the fluctuating work week and that the hours worked did not actually fluctuate. The Plaintiffs contend that, therefore, the criteria of the fluctuating work week were not met. A plaintiff, to establish that overtime was due as a result of a missed

break, must establish:

- That she worked 40 hours in a specific week.

- That she actually worked during a break.

- That the time was not replaced in the system (i.e., she was not paid for a missed break).

- That plaintiff was shorted overtime as a result.

- That the overtime was brought to the attention of management and the shortage was not corrected.

*See White v. Baptist Hospital*, 134 S. Ct. 296, 187 L.Ed. 2d 153.

These issues all are liability issues, not damages issues, as is the question of whether Plaintiffs had clear understanding of the fluctuating work week. Individuals may have different proof based on their hire dates, what supervisor explained the pay system to them, whether they received and signed an agreement and/or handbook and several other individualized factors.  Notably, contrary to Plaintiffs' counsel's contentions in this case, the individual need only be made aware of the fact that the fixed salary was to cover all hours worked.  The intricacies of the calculation of overtime need not be understood nor even

explained.[2]

The testimony from the sample of Plaintiffs deposed to date is widely divergent in respect to all of these liability issues.

## II. PLAINTIFFS' STATE LAW CONTRACT ACTION IS NOT SUITABLE FOR COLLECTIVE CERTIFICATION AND SHOULD BE DISMISSED

The only action that may be certified in this case as a collective action are those which fall under the Fair Labor Standards Act.

Plaintiffs could have, but did not, move for certification of the contract claims as a class action under Federal Rule of Civil Procedure 23. The method and criteria of class actions under Rule 23 are fundamentally different than a collective action. *See, e.g., Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 n. 12 (11th Cir.1996) ("[I]t is clear that the requirements for pursuing a § 216(b) class action are independent of, and unrelated to, the requirements for class action under Rule 23 of the Federal Rules of Civil Procedure."). Accordingly, as an initial matter, the state law claims should be dismissed.

---

[2]      *See Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 636-37 (5th Cir. 2001) (rejecting argument that 29 C.F.R. § 778.114 required an employee to understand the number of hours the employer would expect him to work or that he would not receive his fixed salary for weeks in which the he did not work at all); *Bailey*, 94 F.3d at 155 (holding that the defendant did not have to prove that each plaintiff "knew that the more overtime he or she worked, the less he or she would be paid for each of those overtime hours"); *Lance*, 2005 U.S. Dist. LEXIS 14949, 2005 WL 1785315, at *7-8 (finding that a "clear mutual understanding" existed because the plaintiff "understood the critical aspects of the FWW," even though he did not understand exactly how to calculate his overtime rate using the formula); *Stein v. Guardsmark, LLC*, No. 12 Civ. 4739 (JPO), 2013 U.S. Dist. LEXIS 103131, 2013 WL 3809463, at *9 (S.D.N.Y. July 23, 2013).

### III.   IN THE INSTANT CASE, FACTS SUPPORTING LIABILITY MAY NOT BE DETERMINED ON CLASS WIDE BASIS THROUGH SAMPLE TESTIMONY

**A.**   **Some Plaintiffs Testified That They In Fact Typically Or Always Took Allotted Breaks Or, When They Did Not Take Them, Failed To Inform Management They Had Not Taken A Break.**

1.   <u>Testimony of Bernard Artumus at page 34, lines 2-18 of his deposition transcript (Artumus Deposition Excerpts attached hereto as Exhibit 2):</u>

Q.   What time did the staff members take their breaks?

A.   I'm not aware.

Q.   Did you ever take a break while you were there?

A.   I did.

Q.   On what occasions would you take a break or how would that come about?

A.   The supervisor would say, you know, you can take your break or you don't have to.

Q.   But typically you would take your break?

A.   Yes, after four hours.

Q.   So it was one break every four hours?

A   Yes.

Q.   What would you do on your break?

A.     Just completely isolate myself for the

time that I was on break. . . .

2.     <u>Plaintiff Steven Liner testified as follows at page 26, lines 1-14</u>

<u>of his deposition transcript (Liner Deposition Excerpts attached hereto as Exhibit</u>

<u>3)</u>:

A.     Well, there were two people upstairs and there

was   another   gentleman   named   Mr.   Flagg   that

provided the breaks for the building.

Q.     And   he   would   come   down   and   relieve   you.

What would you do on your break?

A.     I would stay on the unit.

Q.     Would you eat or anything like that?

A.     No. I try not to eat a lot at night.

Q.     So read a book, listen to the radio --

A.     Yes.

Q.     -- that sort of thing?

A.     Yes.

Q.     Kind of relax and chill-out?

A.     Uh-huh.

3.      <u>David Thompson (a current opt-in Plaintiff) testified at page 38, lines 6-11 of his deposition as follows (Thompson Deposition Excerpts attached hereto as Exhibit 4):</u>

Q.      Okay. So during your period as a supervisor,

there were some teacher counselors that got a break

every single day?

A.      Uh-huh (affirmative).

Q.      No matter what?

A.      Uh-huh (affirmative).

4.      <u>The Declaration of Sheila Bryson (putative Plaintiff who did not opt-in) is attached hereto as Exhibit 5.</u>  Ms. Bryson testifies that missing breaks in her unit (Unit 2) was indeed "rare."  She has been a teacher counselor for six (6) years.

5.      <u>The Declaration of Roxanne Campbell (putative Plaintiff who did not opt-in) is attached hereto as Exhibit 6.</u>  Ms. Campbell, who is a teacher counsel in Units 3, 4 and 5, also states that it was rare to miss a break and that her supervisor encouraged her to take breaks.

6.   <u>The Declaration of Alonzo Moore (putative Plaintiff who did not opt-in) is attached hereto as Exhibit 7</u>.  Mr. Moore, who is a teacher counselor in Units 1 and 2, also states there was always time to take a break on the second shift because the children were asleep much of the time.

7.   <u>Rebecca Schwam testified at page 41, lines 13-24 and page 42, lines 1-5 in respect to her break habits on Defendant's "Blue" unit (Schwam Deposition Excerpts attached hereto as Exhibit 8)</u>:

Q.   What was the break policy?

A.   It was a half hour off the clock. That's

all I knew of, was half an hour off the clock.

Q.   When you were in Blue the first six months

you were there, did you take a break?

A.   Yes.

Q.   How frequently?

A.   Maybe like half the time, little more than

half.

Q.   Why would you not take the break?

A.   I just figured I would stay on the clock;

that I didn't need a break. I just figured I would

work through it.

Q.     Did you do anything to report that you had

worked through the break?

A.     Not at that time. They would ask me if I

want a break and I would be like, no, I'm okay.

8.     Plaintiff Stephen Ventre testified at page 38, lines 13-24 and

page 39, lines 1-12 of his deposition (Ventre Deposition Excerpts attached hereto

as Exhibit 9):

A.     Yes.

Q.     Now, during the weeks that you did not have

any acting-out behavior tell me about when you

would take your break.

A.     On second shift?

Q.     Yes, on second shift.

A.     Even when we didn't have acting-out behavior

we would typically take our breaks after the kids

went to bed, which at the latest would be I think 9:00

-- 8:30, 9:00. We still worked from 9:00 to 11:30

until third shift came, so when the kids are asleep it's

a lot easier to take breaks.

Q.    You do that regardless, if there were acting-out kids or not?

A.    No. When we have five people, yes, because we're still within ratio, so we would just rotate breaks during that time, or maybe an hour, half hour before 9:00, we would start it then if the day was going well.

Q.    And then your breaks, what could you do on your breaks?

A.    We could leave campus; whatever you wanted to do.

Q.    Was there a place that you used to go?

A.    Used to go to Subway.

9.    <u>Plaintiff Willoughby testified at page 100, lines 21-25 and page 101, lines 1-14 of his deposition (Willoughby Deposition Excerpts attached hereto as Exhibit 10)</u>:

Q.    And what was the purpose of the break log?

A.     Keep track of, you know, if we took a break or not.

Q.     Did you fill it out if you took a break or did you fill it out if you did not take a break?

A.    If we had time, we'd fill it out. If I had time, I'd fill it out. If I didn't have time, it would be blank.

Q.    Okay. What's the occasion for you to fill out the break log? Why would you be putting something in the break log?

A.    If I took the break or not.

Q.     So if you took the break, you filled out the log; if you didn't take the break, you filled out the log.

A.    No, we didn't.

Q.    Okay.

A.    I didn't fill out the log. . . .

B.      **Others Sought and Were Granted Corrections to Pay When Pay Discrepancies Were Discovered.**

1.      Mr. Artumus testified in respect to correction of a miscalculation of pay that he believed he had been shorted on four occasions and took the issues to management.  On two occasions, he was provided a separate check and on two occasions, the error was determined by the business office to be his own error.  (Artumus Deposition Excerpts, p. 42, ll. 5-24; p.43, ll. 1-5, Exhibit 2 hereto):

> Q.   What do you mean?
>
> A.   They found out that they had a, you know, miscalculation and they had to go back and, you know, reissue another check. There were several times where they had to reissue a check right from the business office.
>
> Q.    And they actually made the error and they paid you back?
>
> A.   Correct.
>
> Q.   How many times did that happen?
>
> A.   About two or three times.

Q.    And then one or two times they said no, you're
wrong?

  MS. BURKE: Object; mischaracterizes his
  testimony.

  MR. MULROY: I thought that was his
  testimony.

  MS. BURKE: It was four.

Q.   (By Mr. Mulroy) On one or two occasions you
went in and they said no, that you were wrong?

A.    Yes.

Q.    There were about a total of four times that this
occurred that you had a discrepancy in your pay?

A.    Yes.

2.  <u>Byron Graham (speaking of a complaint about pay with Mr.
Dowdell, his manager) testified at page 42, lines 9-21 of his deposition (Graham
Deposition Excerpts attached hereto as Exhibit 11):</u>

  He -- You know, he said -- From then on, he told me

  to -- From then on, he told me to let him know at the

  end of the week when he didn't have a break -- when

I didn't have a break. And I would e-mail it or text it

to him and say, hey, I didn't have a break Monday or

Tuesday or whatever, whatever day it was.

Q.    After you spoke with Mr. Dowdell, did he add

the time back in for the week in question that you

were discussing with him?

A.    I'm sure he did. I can't say for definite, but I'm

sure he did. Because I didn't -- I didn't have a issue

after that. I mean...

3.    Steve Reid testified at page 37, lines 16-24 and page 38, lines 1-6 of

his deposition transcript (Exhibit 12):

Q. Did you ever have a dispute about what time you

should either be clocked in or clocked out?

A.   There may have been one time.

Q.   Tell me about that.

A.   The supervisor came in and saw that I didn't have

a clock-in and said, "I know you were here.  Did you

work?" I said, "Yeah, I did."  He said, "What time

did you come in?" "I came in at this time."   They

would verify it with another employee.  They said,

"All right.  Make sure you clock-in next time."

Q. And was there ever a time, though, when you guys

couldn't reach an agreement as to what time you

clocked in?

A.  No, there never was a time.

4.     Paul Willoughby transcript at page 114, lines 11-25 (Exhibit 10):

Q. And then those days that you didn't take a lunch

break, or you didn't take a meal break, the half-hour

meal break for every six hours, on those days you

were supposed to fill out a log that showed whether

or not you took a break; correct?

A.    Correct.

Q.   And the purpose of that log was to pay you for

those hours that -- where you didn't take a break;

correct?

A.  I suppose that's what they're supposed to do.

Q.  Okay. And you didn't take the time even to fill

out the log.

A.  Too busy.

Q.  Okay.

5.      William Booze, Jr. transcript at page 52, lines 6-18 (Exhibit 13):

Q.  Did staff have difficulty filling out the break log?

And by "staff," I mean counselors.

A.  When you say "difficulty," you're referring to?

Q.      Well, was that -- was that something that counselors found it -- either from a time standpoint or from just a remembering it standpoint, counselors found it difficult to remember to -- to fill out the break log?

A.  I don't think so, no.

Q.  Okay. Did you yourself fill out the break log?

A.  Yes.

6.      Byron Graham testified in respect to correction of time entries at page 42, lines 16-25 and page 43, lines 1-9 of his transcript (Exhibit 11):

Q.  After you spoke with Mr. Dowdell, did he add the time back in for the week in question that you were discussing with him?

A. I'm sure he did. I can't say for definite, but I'm sure he did. Because I didn't -- I didn't have a issue after that. I mean...

Q.  So after you spoke with him, your breaks would not be deducted if you didn't take them? Is that what you -- You said you didn't have an issue after that.

A.  I -- Well, when I say I didn't have an issue with me coming up short and he taking my vacation days and -- I didn't have an issue with him automatically taking the break without me letting him know. Unless I didn't tell him. If I didn't tell him, if I didn't text it, he took it.

Wasn't no big thing to me. As a matter of fact, it wasn't no big thing to me that time. . . .

**C.   Employees Varied As To Their Admitted Understanding Of The Fluctuating Work Week And Their Agreement With Defendant.**

1.     *See* Artumus transcript page 23, lines 17-22; page 24, lines 21-24; and page 25, lines 1-22 (Exhibit 2):

Q.   (By Mr. Mulroy) Looking at the compensation agreement, do you recognize the signatures on the second page?

A.   Yes.

Q.   Whose signature is that?

A.   They're mine.

Q.   So every two weeks you would get a check for $538.40 times two less for deductions; is that correct?

A.   Correct.

Q.   And then at times you would get a little bit more than that, correct?

A.   If we worked overtime.

Q.   So you got paid for the overtime?

A.   If it was approved, yes.

Q.   And who had to approve it?

A.   Supervisors.

Q.   And did you ever ask for and have your overtime approved?

A.   No.

Q.   And your pay records should reflect you never got overtime?

A.   I had gotten overtime, yes.

Q.   Why would you get overtime if it wasn't approved?

A.   Basically if they told you that they needed you, then you would just go ahead and do it. You don't have to ask anybody can they approve the overtime.

Q.   So if they asked you to stay overtime then you would get paid overtime?

A.   Correct.

2.   <u>Lavon Flood's understanding of the agreement at page 54, lines 3-14 of his deposition (Flood Deposition Excerpts attached hereto as Exhibit 14):</u>

He was asked if he recognized his compensation agreement.

A.   Yes.

Q.   How do you recognize it?

A.  I recognize it as the form that I signed when I understood -- what I understood I would get paid per week.

Q.  Did you understand this document at the time you read it?

A.  Yes, I understood it.

Q.  You understood the half-time calculations at the bottom?

A.  I understood that I would be compensated for each hour that I worked, so, yes, I understood it.

3.   Steve Liner at page 33, lines 7-24 and page 34, lines 1-3 of his deposition transcript (Exhibit 3):

Q.  What is Exhibit 31?

A.  It's the compensation agreement.

Q.  And did you at the time read it and understand it?

A.  Yes.

Q.  It's my understanding from your testimony today that the part that you don't agree with is the half-time?

A.  Correct.

Q.  Let me ask you, did in fact Youth Villages pay you in accord with this compensation agreement?  In other words, did they do what they said they were going to do in the compensation agreement?

MS. BURKE: Object to the extent it calls for a legal conclusion, but you can answer it.

Q.  (By Mr. Mulroy) You can answer it.

MR. MULROY: By the way, it doesn't call for a legal conclusion.

A.  I think they did what they said they were going to do. I don't agree with what they do.

4.   Steve Reid's understanding of the compensation Agreement at page 67, lines 21-24, page 68, lines 1-3 of his transcript and deposition Ex. 29 (Agreement) are attached hereto as Exhibit 12):

Q.  When you signed this agreement you understood it, correct?

A.  I didn't agree with it but I signed it.

Q.  And you understood it?

A.   I understood it.

Q.   You're a former payroll clerk, right?

A.   Correct, I am.

## IV.   STANDARD FOR DECERTIFICATION

In seeking compensation for unpaid overtime under the FLSA, an employee may bring a collective action against his employer on behalf of other "similarly situated" employees.  29 U.S.C. § 216(b).  A collective action is appropriate when it permits the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [misconduct]."  *Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 170, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989).  Unlike class actions under Rule 23 of the Federal Rules of Civil Procedure, where all qualifying class members are party-plaintiffs unless they "opt-out" of the action, "[p]articipants in a § 216(b) collective action must affirmatively opt into the suit." *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1258 (11th Cir. 2008).

The Eleventh Circuit, together with other circuits, has adopted a two-stage process in certifying a collective action, the conditional certification or notice stage, and the final certification stage.  In the instant case, we are now at the second stage.

The second stage occurs towards the close of discovery, and is generally

precipitated by an employer's motion for decertification.  *Anderson v. Cagle's, Inc.,* 488 F.3d 945, 953 (11th Cir. 2007).  At this second stage, "the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question."  *Id..*  Based on the more extensive factual record, the "similarly situated" standard at the second stage is "less lenient, and the [employee] bears a heavier burden."  *Morgan*, 551 F.3d at 1261.  The Eleventh Circuit has identified the following three factors when considering the "similarly situated" issue at the second stage: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations."  Ultimately, the decision on whether or not to decertify a collective class action "rests largely within the district court's discretion."  *Anderson,* 488 F.3d at 953.

The fact that a Plaintiff is denied a break and is not paid for it does not alone create FLSA liability under the prevailing case law.  Rather, the Plaintiffs each must establish that for each week they have claimed overtime, they actually worked more than forty hours a week.[3]  In addition, in automatic deduction cases a

---

[3]        Also, there is no issue that straight time is available for break deduction if less than 40 hours is worked since, under the fluctuating work week, the fixed salary is to cover all hours worked "whether many or few."  In view of the standard analysis done by Defendant's expert, the allegations that Plaintiffs' hours did not fluctuate as contained in the Complaint is refuted.  Attached as Exhibit 15 hereto are excerpts of Defendant's expert report.

plaintiff must also establish he reported the missed break to management and used the reasonable measures adopted by the employer to report such missed breaks. Merely mentioning overtime, even repeatedly, to a supervisor has been found not to be enough. *White v. Baptist Hospital*, 134 S. Ct. 296, 187 L.Ed. 2d 153; *Hertz v. Woodbury County*, 566 F.3d 775, 781-82 (8th Cir. 2009); *Newton v. City of Henderson*, 47 F.3d 746, 749-50 (5th Cir. 1995); *Forrester v. I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414-15 (9th Cir. 1981); *Raczkowski v. TC Construction Co., Inc.*, 1993 U.S. App. LEXIS 26257, at *3 (9th Cir. Sept. 30, 1993); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981).

Moreover, despite Plaintiffs' contentions to the contrary, it is their burden to establish that Defendant did not properly use the fluctuating work week. The Eleventh Circuit, has followed the Fifth Circuit's placement of the burden of proof on Plaintiff to establish that the employer has failed to properly implement the fluctuating work week method of pay. *Davis*, 61 Fed. Appx. 671, 2003 WL 21488682, at *3 (citing *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 636 (5th Cir. 2001). In *Samson*, the court held that because the fluctuating workweek is neither a defense nor an exemption to the FLSA, the employee has the burden of proving that the method does not apply to his case. Any proof of this may likewise

---

However, the degree of fluctuation may vary between the various units depending on the severity of behaviors on the unit, staffing availability, and individual practices regarding scheduling breaks.

vary from unit to unit and individual in view of the multiple elements of proof in an automatic break case.

A group of opt-in plaintiffs cannot be similarly situated for purposes of a collective action when individual determinations regarding liability must be made. *See Reich v. Homier Distrib. Co., Inc.,* 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005) (collecting cases). Here, some Plaintiffs did not actually work overtime hours and others sporadically claim to have missed meal breaks. Others expressed an indifference to overtime and the reasonable reporting structure put in place by Defendant to report break time or bring pay discrepancies to management's attention. These differences between Plaintiffs go to the factual proof of liability and Defendant's defenses. These essential facts vary between the individual Plaintiffs. The issue of liability is therefore not susceptible to common proof or imputing such proof to the remaining portion of the class.

The fact that the Plaintiffs were assigned to different units, different supervisors, and different shifts further adds to the problem of treating this as a single case. Several sample Plaintiffs readily acknowledge their own supervisors to have been responsive to requests for corrections, while others may or may not have been. Although all opt-in Plaintiffs admitted that they signed a compensation agreement, some Plaintiffs appear to claim by a reading of the Complaint that the

fluctuating work week does not apply to them because they did not have a clear understanding of how they were to be paid.  In fact, as shown above by the cited testimony, this is one of the elements of proof in regard to the fluctuating work week aspect of this case which is not susceptible to uniform proof and should not be imputed to the 30 or more other class members who have not been deposed.[4]

It would be unjust to require Youth Villages to pay overtime pay to a subset of Plaintiffs who had either no claim at all or *de minimus* claims.  *Melendez, et al v. Gentiva Health Services, Inc.*, 2014 U.S. Dist. LEXIS 69217 (U.S.D.C. N.D. Ga. 2014).

While it is true that courts "authorize some employees to testify about the number of hours they worked and how much they were paid so that other non-testifying plaintiffs could show the same thing by inference," *Morgan*, 551 F.3d at 1278-79, such use of representative testimony is based on the burden-shifting

---

[4]     The courts have permitted the "fluctuating work week" as an alternative method of overtime compensation from the usual time and one-half overtime for those employees whose hours fluctuate if the requirements of 29 C.F.R. § 778.114 are met.  *See Burgess*, 805 F. Supp. at 348.  "Section 778.114 provides that a salaried employee whose hours of work fluctuate from week to week may reach a mutual understanding with his employer that he will receive a fixed amount as straight-time pay for whatever hours he is called upon to work in a workweek, whether few or many, and that he will be compensated for his overtime work at a rate of fifty percent of his regular hourly pay." *Condo v. Sysco Corp.*, 1 F.3d 599, 601 (7th Cir. 1993), cert. denied, 510 U.S. 1110, 127 L. Ed. 2d 373, 114 S. Ct. 1051 (1994); *see also Spires v. Ben Hill County*, 745 F. Supp. 690, 702-04 (M.D. Ga. 1990), aff'd, 980 F.2d 683 (11th Cir. 1993).  An employer is not required to show that the employee actually understood how to compute overtime.  However, at a minimum, the employer must provide its employees with a reasonably clear and accurate explanation of their compensation.  (Emphasis added.)  *See Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644, 648 (6th Cir. 1986) (clear mutual understanding when employee signed explanatory calculation form for fluctuating work week method); *Condo*, 1 F.3d at 602 n.4 (employment contract contained a chart illustrating the method of overtime pay).  (Emphasis added.)  In the instant case, each Plaintiff had been provided and signed an explanation modeled after the DOL regulation implementing the fluctuating work week concept.  This was a condition of employment at Youth Villages for teacher counselors.

analysis established in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). *Mt. Clemens* makes clear that its burden-shifting analysis is only applicable when damages are certain and "[t]he uncertainty lies only in the amount of damages arising from the statutory violation by the employer." *Id.* Therefore, representative testimony regarding hours worked to determine an amount of damages is inappropriate when the issue of liability, *i.e.* whether or not any damages actually exist, is still in question in regards to Plaintiffs. *Id.* (stating that "the rule that precludes the recovery of uncertain and speculative damages . . . applies only to situations where the fact of damage is itself uncertain.").

## CONCLUSION

### A. State Law Claims Should be Dismissed.

The Plaintiffs' state law contract claims must be dismissed since Plaintiffs did not attempt to gain class certification of that question under Federal Rule of Civil Procedure 23, and it is not a claim arising under the Fair Labor Standards Acts collective action provisions.

**B.** **The FLSA Action Should Not Proceed as a Collective Action.**

The collective action should be decertified in view of the disparate proof among individual Plaintiffs in respect to liability both with regard to the fluctuating work week analysis and with regard to an analysis of missed time due to automatic pay deductions, whether such missed time was reported to supervisors or managers, and if so, whether corrections were made.  These individualized liability facts cannot in fairness be imputed to all Plaintiffs in view of the wide divergence in the testimony concerning liability and potential defenses.

According, all but Plaintiffs Willoughby, Stephenson and Davis' claims should be dismissed without prejudice.

DATED this 6th day of February, 2015.

Respectfully submitted,

s/ James R. Mulroy, II
James R. Mulroy, II
(TN Bar No. 000098)
JACKSON LEWIS P.C.
999 Shady Grove Road, Suite 110
Memphis, TN 38120
Telephone: (901) 462-2600
Facsimile: (901) 462-2626
Email: mulroyj@jacksonlewis.com
*Admitted pro hac vice*

Eric R. Magnus
(GA Bar No. 801405)
JACKSON LEWIS P.C.
1155 Peachtree Street, NE, Suite 1000
Atlanta, GA 30309
Telephone: (404) 525-8200
Facsimile: (404) 525-1173
Email: magnuse@jacksonlewis.com


Kelly S. Carlson
(TN Bar No. 014325)
Youth Villages, Inc., General Counsel
3320 Brother Blvd.
Memphis, TN 38133
Telephone: (901)251-4964
Facsimile: (901)251-5005
Kelly.Carlson@YouthVillages.org
*Admitted pro hac vice*

Attorneys for Defendant

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 6th day of May 2015, I electronically filed the foregoing instrument with the Clerk of Court via CM/ECF, which will serve a copy on the following:

> Douglas R. Kertscher, Esq.
> Julie Hoehn Burke, Esq.
> Hill, Kertscher & Wharton LLP
> Riverwood 100
> 3350 Riverwood Parkway, Suite 800
> Atlanta, GA  30339
> Telephone: (770) 953-0995
> drk@hkw-law.com
>
> *Attorneys for Plaintiff*

> s/ James R. Mulroy, II
> Counsel for Defendant

4848-6494-0065, v. 1